**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.:   1:14-cv-189

**MICHAEL SCATA and JEANNIE SCATA**, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

**NATIONSTAR MORTGAGE LLC**, a Delaware limited liability company,

Defendant.

## CLASS ACTION COMPLAINT AND JURY DEMAND

### NATURE OF THE ACTION

1.      Plaintiffs Michael Scata and Jeannie Scata ("the Scatas" or "Plaintiffs") bring this suit on behalf of themselves and Classes of similarly situated homeowners across the nation to challenge Defendant Nationstar Mortgage LLC's ("Nationstar" or "Defendant") deficient, unfair, and deceptive loan servicing practices and systematic failure to offer qualified borrowers Trial Period Plans ("TPPs") under the Federal Home Affordable Modification Program ("HAMP").

2.      Nationstar operates as a servicer of residential mortgage loans owned by third parties and as an originator of mortgage loans directly to consumers. As of September 30, 2013, Nationstar claims to service a loan portfolio with an aggregate unpaid principal balance in excess

of $375 billion.[1] Many of its portfolios are viewed as being "high risk" or having special servicing needs. According to Nationstar, it "make[s] asset performance [its] primary goal and use[s] a flexible, high-touch servicing model designed to maximize borrower contact to increase cash collections while reducing delinquency and losses."[2]

3.      In the wake of the historic collapse of the housing market in 2008 and 2009, major banking institutions (e.g. Bank of America, N.A. ("BAC")) entered into periodic agreements whereby they transferred Mortgage Servicing Rights ("MSRs")—especially for troubled loan portfolios—to third party loan servicers (e.g. Nationstar). The MSRs for loan portfolios are also frequently transferred from one servicer (e.g. Aurora Bank FSB ("Aurora")) to another servicer (e.g. Nationstar). Nationstar thus grows its business by acquiring the MSRs for massive loan portfolios owned by third party banks.

4.      As part of its servicer role, Nationstar agreed to participate in the HAMP—a federal loan modification program designed to help struggling homeowners avoid foreclosure and stay in their homes. Specifically, in or around May 2009, Nationstar signed a contract with the U.S. Department of the Treasury, through the Treasury's agent, Fannie Mae, agreeing to participate in the HAMP as an approved HAMP servicer.

5.      Unfortunately for homeowners whose mortgage loans are serviced by Nationstar, Nationstar has systematically refused to process HAMP applications, repeatedly claimed to have never received borrower documents, continued to find new requests for documents not necessary to consider the modification application, and initiated foreclosure proceedings despite providing

---

[1]      About Us, https://www.nationstarmtg.com/customercenter/AboutUs.aspx, last viewed January 17, 2013.

[2]      Special Servicing, http://www.nationstarspecialservicing.com/why-nationstar/our-approach, last viewed January 17, 2013.

repeated assurances to borrowers that the mortgages would not be foreclosed on during the loan modification review period.

6.      Nationstar's failure to acknowledge receipt of documents, refusal to process loan modification applications, and improper foreclosure of borrowers while being considered for a loan modification is no accident. As one of the nation's largest loan servicers, Nationstar has knowingly established a system designed to ignore its obligations, wrongfully deprive eligible HAMP borrowers of an opportunity to modify their mortgages, and force borrowers into foreclosure or other less-beneficial loan modification alternatives. At its core, Nationstar's system is a profit-maximizing endeavor in which Nationstar purchases massive quantities of MSRs without any regard for its actual servicing practices. Nationstar's actions are fraudulent and violate federal fair lending laws.

## JURISDICTION

7.      Jurisdiction is proper pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). This claim is brought as a putative class action consisting of over 100 class members in which the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a State different from the Defendant. Further, none of the exceptions under that subsection apply.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as unlawful practices are alleged to have been committed in this District, Defendant regularly conducts business in this District, and the property securing the loan forming the subject of the Parties' dispute is located in Boulder County, Colorado, which is in this District. This Court has

supplemental subject-matter jurisdiction over any ancillary or pendent state law claims under 28 U.S.C. § 1367.

## PARTIES

9.      Plaintiffs Michael Scata and Jeannie Scata are natural persons and citizens of the State of Colorado. The Scatas reside on Four Rivers Road in Boulder, Colorado and their home mortgage is one of the loans at issue in this lawsuit. At all times relevant, the Scatas were qualified and eligible to participate in the HAMP under all applicable directives and guidelines.

10.     Nationstar Mortgage LLC is a Delaware limited liability company with its principal place of business at 350 Highland Drive, Lewisville, Texas 75067.

## FACTUAL BACKGROUND

### The Sale of MSRs to Firms that Specialize in Servicing

11.     An MSR is a set of servicing rights, conditions, and responsibilities that are completed by a loan servicer in return for a payment. The holders of MSRs (i.e. servicers) collect fees for managing loans on behalf of investors who own the loans. Servicing involves various tasks such as sending out bills, performing collections, properly distributing payments, managing escrow accounts, and handling the foreclosure process for defaulting borrowers.

12.     Mortgage loan originators generally have two choices of what to do with the MSRs for the loans they originate. Originators can hold the MSR and collect interest from the point of origination until the loan is paid off, or they can sell the MSR to another entity in return for cash. Prior to the collapse of the U.S. housing market, servicing release premiums typically

yielded 5x or more of the underlying MSR yearly payment.[3] That multiple is believed to have dropped to around 4x shortly after the housing market collapse, and today the expected return is likely between 1x and 2x.[4]

13.    Regardless, large banking institutions (e.g. BAC) are continuing to sell MSRs in an effort to rid themselves of unfavorable assets. One of the driving factors has been changes in regulatory capital, which classify MSRs as riskier assets that require more equity to cover potential losses. Buyers of MSRs have thus included firms, such as Nationstar, that specialize in servicing and aren't necessarily subject to the same oversight as banks.

14.    The sale of MSRs by large banks further stems from the consolidation of the banking industry after the housing market collapse. Large financial institutions merged and formed even larger organizations, such that banks are hitting (or exceeding) their capacity limitations. Accounting standards used for MSRs have further supported the sale of MSRs because they are sensitive to interest rate changes, such that banks have been forced to write down MSRs as interest rates fell. Banks have also needed to write down MSRs because so many mortgages have gone into default over the past five years.

15.    The problem is banks have been selling MSRs to servicers (like Aurora and Nationstar) that lack the resources, ability, oversight, care, purpose, and incentives necessary to adequately service loans in accordance with federal law and common law rights. This includes serial and pervasive instances of lost documentation, false claims of lost documentation, the improper application of payments, and unsupportable refusals to honor loan modification

---

[3]    L. Sigurd, *The Opportunity in Mortgage Servicing Rights*, Seeking Alpha, (Apr. 24, 2012, 1:59 p. m.), http://seekingalpha.com/article/522501-the-opportunity-in-mortgage-servicing-rights.

[4]    *Id.*

contracts. Given that a meaningful portion of the MSR portfolios consists of troubled loans, these improper and illegal servicing practices place already struggling homeowners in an even more precarious position and force them further down the path toward foreclosure.

***Congressional Response to National Foreclosure Crisis***

16.     In the midst of the financial crisis, on October 3, 2008, Congress passed the Emergency Economic Stabilization Act of 2008. On February 17, 2009, Congress amended the statute by passing the American Recovery and Reinvestment Act of 2009 (collectively the "Act"), 12 U.S.C. § 5201 *et seq.* The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership." 12 U.S.C. § 5201.

17.     The Act granted the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program ("TARP"). 12 U.S.C. § 5211. Under TARP, the Secretary was empowered to purchase or make commitments to purchase troubled assets from financial institutions. *Id.* In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities." 12 U.S.C. § 5213(3). The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and that uses the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures." 12 U.S.C. § 5219. The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to

prevent avoidable foreclosures" and imposes parallel mandates to implement plans to maximize assistance to homeowners and minimize foreclosures. 12 U.S.C § 5220.

### Servicer Participation in the HAMP

18.     On or about February 18, 2009, acting in accordance with their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the HAMP. Under HAMP, the federal government incentivizes participating loan servicers to enter into agreements with struggling homeowners that will make adjustments to existing mortgage obligations that result in more affordable monthly payments. Servicers receive $1,000.00 for each HAMP modification.

19.     The industry entities that perform the actual interface with borrowers—including such tasks as payment processing, escrow maintenance, loss mitigation and foreclosure—are known as HAMP servicers.

20.     To participate in the HAMP, a servicer must execute a Servicer Participation Agreement ("SPA") with the federal government. In or around May 2009, Nationstar signed an SPA agreeing to participate in the HAMP as an approved HAMP servicer. Nationstar thereafter executed an amended SPA in or around September 2010. (*See* Amended SPA, attached as Exhibit A.)

21.     The SPA and amended SPA executed by Nationstar incorporate all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications" issued by the Treasury, Fannie Mae or Freddie Mac, in connection with the duties of Participating Servicers. The SPA and amended

SPA mandate that a Participating Servicer "shall perform" the activities described in the HAMP

Documentation "for all mortgage loans it services."

22.    The HAMP Documentation requires that Participating Servicers evaluate *all loans*

that are delinquent sixty (60) days or greater for HAMP modifications. In addition, if a borrower

contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer

must collect income and hardship information to determine if the HAMP is appropriate for the

borrower. This case challenges Nationstar's systematic refusal to acknowledge the receipt of

application materials sent by borrowers requesting to be considered for a loan modification and

its wrongful foreclosure of borrowers during the modification review process.

***Trial Payment Plans (TPPs or Trial Plan) and Permanent Modification Agreements (PMAs)***

23.    A HAMP Modification consists of two stages. First, a Participating Servicer is

required to gather a borrower's financial and other relevant information and, if the borrower

qualifies, offer the borrower a TPP. The TPP generally requires borrowers to make timely trial

payments in the amount shown at a rate designed to keep the borrower in his or her home and to

return any additional documents that may be required by the servicer.

24.    Once the trial is complete, the servicer is to provide the borrower with a PMA for

his or her signature. The servicer may require that the borrower sign two copies and have the

copies notarized before returning them to the servicer. Once signed, the servicer signs and

notarizes the PMA and records the PMA, causing the loan to be permanently modified.

## FACTS RELATING TO NAMED PLAINTIFFS MICHAEL AND JEANNIE SCATA

### *The Scatas fell behind and reached out to Aurora for a modification*

25.     Plaintiffs Michael and Jeannie Scata (the "Scatas") live together in their Boulder, Colorado home that they purchased in 2004. During 2008 to 2009, Mrs. Scata experienced health issues that forced her to close her business.

26.     In or around April 2011, Mr. Scata left his company due to extenuating circumstances and is presently involved in a lawsuit to regain his assets in the company. Since that time, Mr. Scata has been working tirelessly to find new employment but has not been able to secure a full-time job.

27.     By May 2012, it became apparent that the Scatas would no longer be able to make all of their mortgage payments. At that time, Aurora serviced the Scatas' loan. Mr. Scata reached out to Aurora to discuss loan modification options.

28.     On or about May 16, 2012, Mr. Scata met with Spring Board—a non-profit organization that he had been referred to by Aurora—to discuss his modification. During that meeting, he was informed that he was a perfect candidate for a modification because under the HAMP "waterfall" steps, his monthly mortgage payment could be reduced to an amount within the allowable range under HAMP. He was told that there was a high probability that he would be approved for a modification and that he should receive a response within 30-60 days.

29.     In or around May to June 2012, the Scatas submitted their application for a HAMP modification to Aurora. Around this time, Aurora informed him that it would take approximately 30 days to process his application through underwriting. At this time, the Scatas were a few months behind on their mortgage.

***Aurora transfers the MSRs for the Scatas' loan to Nationstar, which drags out the process for over a year***

**June 2012**

30.     On or about June 15, 2012, Aurora sent a letter to the Scatas informing them that "the servicing of your loan, that is, the right to collect payments from you, is being transferred from [Aurora] to Nationstar Mortgage LLC ("Nationstar") effective July 1, 2012." (*See* Aurora Servicing Transfer Notice, attached as Exhibit B). The letter further explained that Aurora was the Servicer for the Scatas' loan prior to July 1, 2012, and Nationstar was the Servicer on or after July 1, 2012. It further stated "[i]f you have questions relating to your loan after June 30, 2012, please contact [Nationstar]." (*Id.*)

31.     The Aurora Servicing Transfer Notice further confirmed that:

> If you previously provided information or documentation to Aurora Bank in support of your request for a possible loan modification under the federal government's Home Affordable Modification Program ("HAMP") . . . Aurora Bank **will be transferring all your documentation to Nationstar Mortgage LLC**.

(*Id.*) (emphasis added). The Scatas never received a notification from Nationstar regarding the transfer of the servicing rights for their loan from Aurora to Nationstar. On information and belief, Nationstar never sent any such notice to the Scatas.

32.     Shortly after receiving the Aurora Servicing Transfer Notice, Mr. Scata contacted Aurora via telephone to inquire about what would happen to his HAMP application. Aurora stated that Nationstar would continue to process the application.

**July 2012**

33.     Mr. Scata promptly contacted Nationstar about his HAMP application and was told that they could not locate the Scatas' loan or any of their HAMP paperwork. On or about

July 10, 2012, Nationstar finally confirmed that they had located the Scatas' loan in the system but informed Mr. Scata that he needed to fill out Nationstar's HAMP paperwork and start the modification process over. On or around July 31, 2012, the Scatas submitted a new HAMP application, hardship affidavit, and other required documents to Nationstar. Shortly thereafter Mr. Scata followed up by sending Nationstar his executed Form 4506-T.

**August 2012**

34.     During the month that followed (in or around August 2012), Mr. Scata frequently contacted Nationstar for a status update on his HAMP modification. Each time he was told that there is a "high volume of modifications" and that he would not hear anything for at least thirty days. During these calls, the Nationstar representatives confirmed that the Scatas had complied with all document requests related to their HAMP application and that they would receive a response to their application within thirty days. The Nationstar representatives also confirmed during these calls that Nationstar would not foreclose on the Scatas during the HAMP modification process.

**September 2012**

35.     On or about September 4, 2012, Nationstar sent a default notice to the Scatas. (*See* Default Notice, attached as Exhibit C.) The notice explained that Nationstar was seeking to collect $9,892.59 and that Nationstar would accelerate the Scatas' loan if they failed to pay the full amount by October 9, 2012. (*Id.*)

36.     On or about September 6, 2012, after being informed that Nationstar required additional documents, the Scatas sent another executed 4506-T form and a copy of the 2011 tax returns to Nationstar employee Aaron Chandler. The Scatas included a note with their

submission stating that the requested Home Owners' Association ("HOA") statement showing they were current on dues was forthcoming.

37.     On or about September 12, 2012, Nationstar sent Mr. Scata a form letter informing him that Nationstar was "missing" the following documents:

> Most recent SIGNED copy of tax return 1040s including all schedules
> Most recent quarterly or Year to Date Profit & Loss statement showing gross income, expenses, and net income
> Homeowners association documentation showing amount and frequency of payment
> Schedule K-1

(*See* September 12, 2012 letter, attached as Exhibit D.) The letter informed Mr. Scata that he was required to mail or fax the above documents to Nationstar by October 12, 2012. (*Id.*)

38.     Three days later, on or about September 15, 2012, Mr. Scata—after speaking with a Nationstar representative via telephone and learning that Nationstar was requesting profit and loss statements for two entities previously owned by the Scatas—sent correspondence to Aaron Chandler. He explained that the two businesses in question—Mr. Scata's Regent Asset Management ("Regent") and Mrs. Scata's Legendary Designs —were no longer operational and were not generating income. Mr. Scata further explained that Regent closed in 2010. He further explained that because of Mrs. Scata's substantial health issues Legendary Design did not generate any income or expenses to report. Mr. Scata attached the HOA documents and final tax returns and a K-1 from 2011 (the last year of income from Regency). (*See* September 15, 2012 letter, attached as Exhibit E.)

**October 2012**

39.     On or about October 3, 2012, Nationstar sent the Scatas another default notice. Around that same time, Nationstar sent Mr. Scata another letter requesting the same documents

described in Nationstar's September 15, 2012 letter. On or about October 7, 2012, Mr. Scata

promptly responded to Nationstar's most recent correspondence by resending the same

documents. (*See* October 7, 2012 letter, attached as Exhibit F.) In his cover letter, he noted: "this

is the second time I'm sending it." (*Id.*)

**November 2012**

40.     On or about November 6, 2012, Nationstar sent the Scatas another default notice.

On or about that same day, November 6, 2012, Nationstar also sent the Scatas a letter notifying

them that:

> We have given your request careful consideration and regret that you do not meet
> the HAMP program guidelines because:  You did not provide us with the
> documents we requested. A notice which listed the specific documents we needed
> and the time frame required to provide them was sent to you more than 30 days
> ago.

(*See* November 6, 2012 Notification, attached as Exhibit G.) Mr. Scata promptly followed up

with Nationstar to discuss the reason for non-approval of his application, including the fact that

he had twice sent all the documents requested by Nationstar. He was instructed to resend a

complete new application package, including all income documentation.

41.     Mr. Scata promptly completed the new application and faxed the application,

4506-T, and updated income documentation to Nationstar. On or around November 20, 2012,

Mr. Scata further complied by emailing income documents to Nationstar representative April

Lyon per her request. (*See* November 2012 Email Chain, attached as Exhibit H.)

42.     On or about November 22, 2012, Nationstar sent the Scatas a new application

package encouraging them to apply for a HAMP modification. This package required the Scatas

to resend a new application, Form 4506-T, and income documentation.

43.     On or about November 28, 2012, Mr. Scata spoke with a Nationstar representative who informed Mr. Scata that the documents he had sent, including his HOA statement, had not been uploaded into Nationstar's loan processing system. She further informed him that a "note" existed in Scata's file indicating that documents were missing, but no indication was found as to the identity of these missing documents. On that same day, Mr. Scata promptly sent a follow up email to his account representative, April Lyon. Mr. Scata attached to his email the following documents:

- Legends 2011 Tax Return,
- Scata Enterprises 2011 Tax Return,
- Regent 2011 Tax Return,
- Coherent 2011 Tax Return,
- RAMSNA 2011 Tax Return
- Scatas' personal 2011 Tax Return,
- Financial Statement,
- Bank Statements,
- HOA statement, and
- Tax Return Signatures.

(*See id.*)

44.     On or about November 29, 2012, Nationstar sent a letter to Mr. Scata requesting the following documents:

RMA (Request for Modification and Affidavit form)
IRS 4506-T SIGNED BY BORROWER(S)
Documentation for all sources of income

(*See* November 29, 2012 letter, attached as Exhibit I.) The letter informed Mr. Scata that he had until December 29, 2012 to fax or mail the documents to Nationstar. Mr. Scata promptly re-sent all required documents to Nationstar. (*Id.*)

**December 2012**

45.     On or about December 30, 2012, Nationstar sent a letter to Mr. Scata informing

him that they were "missing the following **required** documents: Award letter of benefit

statement." (Emphasis included.) The letter informed Mr. Scata that he had until January 29,

2013 to fax or mail the document to Nationstar. Notably, this was a new document request that

had never been requested by Nationstar during any of the previous correspondence.

**January 2013**

46.     On or about January 27, 2013, Nationstar sent a letter to Mr. Scata informing him

that they were "missing the following **required** documents: Most recent quarterly or Year to

Date Profit & Loss statement showing gross income, expenses, and net income." (*See* January

27, 2013 letter, attached as Exhibit J) (emphasis included.) This letter provided that he had until

February 26, 2013 to provide the requested document. (*Id.*)

47.     Notably, Mr. Scata had already sent these documents several times, including

with his original application to Aurora, with his application first sent to Nationstar, in October

2012, and multiple times in November 2012. In fact, throughout the fall of 2012, Mr. Scata

would send and re-send documents and Nationstar would either lose the documents or claim

never to have received them. Mr. Scata would call Nationstar to request an update on the status

of his account and eventual demand to speak with a supervisor or manager. The supervisor or

manager was always "in meetings" and would never take Mr. Scata's calls. Mr. Scata would

eventually get transferred and leave voice messages but never received a call back.

48.     On or about January 30, 2013, Nationstar sent Mr. Scata another letter informing

him that Nationstar was "missing the following **required** documents: Most recent quarterly or

Year to Date Profit & Loss statement showing gross income, expenses, and net income." (*See*

January 30, 2013 letter, attached as Exhibit K) (emphasis included.) This letter provided that he had until March 1, 2013 to provide the requested document. (*Id.*)

**February 2013**

49.     Mr. Scata promptly complied with the document request and, on or about February 6, 2013, Mr. Scata spoke with a Nationstar representative—Ryan—who stated that his documents had been properly received.

50.     Shortly thereafter, in or around mid-February 2013, Mr. Scata spoke with Nationstar representative Loren Shaw who stated that a manager would fix a supposed issue with the Scatas' statements and resubmit them. Mr. Scata followed up shortly after the call to confirm that it had been done but did not receive a call back or voice message.

51.     On or about February 22, 2013, Mr. Scata spoke with a Nationstar representative who indicated that the modified statements still had not been submitted and that his deadline to resubmit the documents was February 25, 2013. On that same day, on or about February 22, 2013, Mr. Scata sent correspondence to Loren Shaw explaining that the manager had not submitted the modified documents. Mr. Scata attached to the letter Profit and Loss statements for the Fourth Quarter of 2012 for all of the Scatas' companies. (*See* February 22, 2013 letter, attached as Exhibit L.)

**March 2013**

52.     On March 24, 2013, Nationstar sent the Scatas a form letter ("Form Letter One") informing them that Nationstar had received their HAMP documents. Specifically, the letter said:

> Thank You! We have received your documentation for the Making Home Affordable Modification Program (HAMP).

Nationstar Mortgage will now review your information to verify that you are eligible for this program. This review process can take between 20-60 days. Nationstar will review the contents of the Financial Solicitation Package and determine if you are eligible for the HAMP based on your gross income. Once a determination is made, you will be sent a written notification of the decision. If it is determined that you are ineligible for HAMP, you will be referred for alternative workout solutions. **Please note that during this evaluation period, your home will not be referred to foreclosure or if your loan has been previously referred to foreclosure, we will continue the foreclosure process while we evaluate your loan for HAMP**. However, **no foreclosure sale will be conducted and you will not lose your home** during the HAMP evaluation.

Nationstar will contact you if more information is needed in order to fully evaluate your request for HAMP.

(*See* March 24, 2013 letter, attached as Exhibit M) (emphasis included in part, added in part.)

53.     Just two days later, on or around March 26, 2013 (before Mr. Scata received the March 24, 2013 letter), Nationstar Representative Carl Webster contacted Mr. Scata to request additional documents. During the call, Mr. Webster told Mr. Scata that if he sent certain documents immediately his file would be processed right away. On that same day, Mr. Scata sent the documents that Mr. Webster had requested, including:

- Updated application,
- 2 months bank statements,
- A letter regarding a 1099,
- 4506-T forms for the Scatas and all entities,
- Fourth quarter financial statements for all entities, including profit and loss detail for Scata Enterprises, and
- A letter explaining that all entities except Scata Enterprises are not operating or generating any income.

(*See* March 26, 2013 letter, attached as Exhibit N.)

**April 2013**

54.     On or about April 7, 2013, Nationstar sent Mr. Scata another letter informing him that Nationstar was "missing the following **required** documents: Most recent quarterly or Year

to Date Profit & Loss statement showing gross income, expenses, and net income." (*See* April 7, 2013 letter, attached as Exhibit O) (emphasis included.) This letter provided that he had until May 7, 2013 to provide the requested document. (*Id.*) Again, Mr. Scata had already submitted these documents on several occasions, including in his most recent March 26, 2013 submission.

55.     In response to the letter, on or about April 20, 2013, Mr. Scata called Nationstar and spoke with a representative—Carolyn—who informed him that he needed to update the documents in his file. On or about April 22, 2013, Mr. Scata promptly sent a fax to Nationstar representative Michele Mosely, which included the following documents:

- March 2013 bank statement,
- Updated profit and loss statements for all entities through the first quarter of 2013,
- 2012 tax returns extensions filed with the IRS for the Scatas' personal tax returns and all entities,
- Corrected 4506-T.

(*See* April 22, 2013 letter, attached as Exhibit P.)

56.     On or about April 27, 2013, Nationstar sent Mr. Scata another letter informing him that Nationstar was "missing the following **required** documents:

> Most recent quarterly or Year to Date Profit & Loss statement showing gross income, expenses, and net income.
> Homeowners association documentation showing amount and frequency of payment
> Documentation for all sources of income

(*See* April 27, 2013 letter, attached as Exhibit Q) (emphasis included.) This letter provided that he had until May 27, 2013 to provide the requested document.

**May 2013**

57.     On or about May 13, 2013, Mr. Scata faxed Nationstar the following documents:

- A new HOA payment statement, and

- Profit and loss statement through the 1st quarter of 2013 for any business entity the Scatas had been previously associated with, including Scata Enterprises—the only active entity—Legendary Designs, RAM, and Coherent Financial Services,

Mr. Scata also included a statement explaining:

> I was not able to get a dissolution statement from the Secretary of State because the companies have been forfeited per the states records. I called the Secretary of State and they said I can't dissolve a company that no longer exists. I have attached a print out from the Secretary of State that shows the companies no longer exist. I trust this will satisfy your requirements.

Mr. Scata further wrote:

> Please proceed with my application ASAP. I have been working on this matter with Nationstar since July 2012. I am very frustrated that it has taken 10 months and I still do not have an approval. We have made monthly payments for over one year. When we receive an approval and our mortgage is modified, I will buy health insurance to ensure an unforeseen problem will not impede our ability to make payments in the future.

(*See* May 13, 2013 letter, attached as Exhibit R.)

58.     On or about May 16, 2013, Mr. Scata spoke with Nationstar representative Mr. Gien. Mr. Gien said that Nationstar had not received the Scatas' documents. Mr. Scata promptly re-faxed all his documents to Mr. Gien that same day. Mr. Gien confirmed that he had received the documents.

59.     On or about May 29, 2013, Nationstar sent Mr. Scata a "FINAL REQUEST-Incomplete Information" letter informing him that Nationstar has "not received the following documentation or the information is incomplete:

> Documentation for all sources of income
> MOST RECENT QUARTERLY OR YEAR TO DATE PROFIT & LOSS STATEMENT SHOWING GROSS INCOME, EXPENSES, AND NET INCOME.

(*See* May 29, 2013 letter, attached as Exhibit S.) This letter stated **"[i]f the required documentation is not received by 6/13/2013 you will be ineligible for this <u>permanent loan modification</u>.**" (*Id.*) (emphasis added.)

**June 2013**

60.     On or about June 5, 2013, Mr. Scata once again faxed Nationstar the First Quarter financial statements for all entities on his 2011 tax return. (*See* June 5, 2013 Fax Cover Page, attached as Exhibit T.) On his cover page, Mr. Scata noted: "Please note that this is the <u>4th</u> time I have sent these in the past two weeks!" (*Id.*)

61.     Despite the Scatas' repeated compliance with Nationstar's requests for documents, on or about June 26, 2013, Nationstar sent Mr. Scata a letter saying he had been declined for the HAMP. (*See* June 26, 2013 Decline Letter, attached as Exhibit U.) Specifically, the letter said:

> We are unable to offer you a Home Affordable Modification because you did not provide us with the documents we requested. Two notices which listed the specific documents we needed and the time frames required to provide them have been sent to you.

(*Id.*)

**July 2013**

62.     After receiving this letter, Mr. Scata continued to follow up with Nationstar. On or about July 8, 2013, Mr. Scata received an email from Nationstar representative Dominic Munoz saying:

> [a]fter further review of your modification, it has come to my attention that your modification was rejected due to missing documents. I can resubmit your modification with all of your documents. I will need your Request for Modification and Affidavit (RMA). We do have a previous RMA on file. If nothing has changed, I will need you to white-out and change the date of your

> RMA to today's date. Send that document back over to me and I will submit your modification for review. I do apologize for the inconvenience. This was an oversight on my end. I looking *[sic]* forward to hearing back from you soon. Thank you for your cooperation.

(*See* July 8, 2013 Email Chain, attached as Exhibit V.) Mr. Scata promptly emailed his revised

RMA to Mr. Munoz on July 8, 2013. That same day Mr. Scata also sent Nationstar a Second

Quarter Profit and Loss statement.

63.     On or about July 13, 2013, Nationstar sent the Scatas another copy of Form Letter

One informing them that Nationstar had received their HAMP documents. Specifically, the letter

said:

> Thank You! We have received your documentation for the Making Home Affordable Modification Program (HAMP).
>
> Nationstar Mortgage will now review your information to verify that you are eligible for this program. This review process can take between 20-60 days. Nationstar will review the contents of the Financial Solicitation Package and determine if you are eligible for the HAMP based on your gross income. Once a determination is made, you will be sent a written notification of the decision. If it is determined that you are ineligible for HAMP, you will be referred for alternative workout solutions. Please note that **during this evaluation period, your home will not be referred to foreclosure** or if your loan has been previously referred to foreclosure, we will continue the foreclosure process while we evaluate your loan for HAMP. However, **no foreclosure sale will be conducted and you will not lose your home** during the HAMP evaluation.
>
> Nationstar will contact you if more information is needed in order to fully evaluate your request for HAMP.

(*See* July 13, 2013 letter, attached as Exhibit W) (emphasis included in part, added in part.)

64.     The next day, on or about July 14, 2013, Nationstar sent Mr. Scata another form

letter ("Form Letter Two") informing him that Nationstar was "missing the following **required**

documents:

> IRS 4506-T signed by borrower(s)

> MOST RECENT SIGNED COPY OF TAX RETURN 1040S INCLUDING ALL
> SCHEDULES.

(*See* July 14, 2013 letter, attached as Exhibit X) (emphasis included.) This letter provided that he

had until August 13, 2013 to provide the requested documents. (*Id.*) The letter also stated:

"Please note that during this evaluation period, your home **will not be referred to foreclosure**."

(*Id.*) (emphasis added.)

65.     On or about July 24, 2013, Mr. Scata sent an email to Nationstar representative

Aaron Sterling. This email included a revised 4506-T for the Scatas personally and all five

entities. (*See* July 24, 2013 fax cover page, attached as Exhibit Y.)

66.     On or about July 27, 2013, Nationstar sent Mr. Scata another copy of Form Letter

Two informing him that Nationstar was "missing the following **required** documents:

> Most recent quarterly or Year to Date Profit & Loss statement showing gross
> income, expenses, and net income
> MOST RECENT SIGNED COPY OF TAX RETURN 1040S INCLUDING ALL
> SCHEDULES.

(*See* July 27, 2013 letter, attached as Exhibit Z) (emphasis included.) This letter provided that he

had until August 26, 2013 to provide the requested documents. (*Id.*) The letter also stated:

"Please note that during this evaluation period, your home **will not be referred to foreclosure**."

(*Id.*) (emphasis added.)

67.     On or about August 23, 2013, Mr. Scata sent a fax to Aaron Sterling. He included

in his fax:

- Typed 2012 tax returns extension for the Scatas personally and their entities, and
- A letter of explanation regarding the 2011 Scata tax return, Schedule C.

(*See* August 23, 2013 fax cover letter, attached as Exhibit AA.) On his cover letter, Mr. Scata asked Mr. Sterling to "[p]lease send the following documents to underwriting ASAP . . .  Please let me know if anything else is needed immediately." (*Id.*)

**August 2013—Nationstar refers the Scatas to foreclosure**

68.     Prior to the August 26, 2013 deadline, on or about August 22, 2013, the law office of Medved Dale Decker & Deere, LLC sent the Scatas a letter informing them that Nationstar had referred the Scatas loan to foreclosure. Specifically, the letter said:

> **YOUR MORTGAGE LOAN HAS BEEN REFERRED TO OUR FIRM FOR FORECLOSURE.**
>
> Our client, NATIONSTAR MORTGAGE LLC, has referred your loan to us for foreclosure. While the foreclosure process has begun, you may still have foreclosure prevention alternatives available to you to avoid the disruption and damage to your credit that a foreclosure sale can cause—BUT YOU MUST ACT IMMEDIATELY.

(*See* August 22, 2013 Foreclosure Notice, attached as Exhibit AB.) As of that date, the Scatas had not missed a loan payment in 18-months.

69.     The Foreclosure Notice went on to inform Mr. Scata that he could supposedly avoid foreclosure by contacting Nationstar regarding loss mitigation options. Specifically, the Foreclosure Notice stated:

> **YOU MUST ACT IMMEDIATELY!**
> NATIONSTAR MORTGAGE LLC may have previously sent you a letter advising you of possible alternatives to foreclosure, along with a Borrower Solicitation Package for you to complete and return to NATIONSTAR MORTGAGE LLC to be evaluated for these alternatives.

(*Id.*)

70.     Upon receiving the August 22, 2013, Mr. Scata called Nationstar and managed to speak with a Nationstar representative who informed him that Nationstar would not accept his

IRS income tax extension forms because they were hand written (even though such forms were acceptable to the IRS). The representative insisted that Mr. Scata had to submit typed extension forms. The representative also stated that Mr. Scata needed to provide a letter of explanation regarding Schedule C to his 2011 tax return.

71.     On August 29, 2013, Medved Dale Decker & Deere, LLC ("Medved") sent the Scatas a "Notice Pursuant To The Fair Debt Collection Practices Act" stating they have been instructed to commence foreclosure proceedings.

72.     On August 30, 2013, Nationstar sent Mr. Scata another copy of Form Letter Two informing him that Nationstar was "missing the following **required** documents:

RMA (Request for Modification and Affidavit form)

(*See* August 30, 2013 letter, attached as Exhibit AC) (emphasis included.) This letter provided that he had until September 14, 2013 to provide the requested documents. (*Id.*) The letter also stated: "Please note that during this evaluation period, your home **will not be referred to foreclosure**." (*Id.*) (emphasis added.)

**September 2013**

73.     On September 11, 2013, US Bank National Association as Successor Trustee to Bank of America N.A. ("U.S Bank") represented by Medved moved the Colorado District Court, County of Boulder, Colorado, for an Order Authorizing the Foreclosure Sale of the Scatas' property. (U.S. Bank v. Scata et al., No. 2013CV031361 (Dist. Ct. Colo.))

74.     On or about September 15, 2013, Nationstar sent Mr. Scata another copy of Form Letter Two informing him that Nationstar was "missing" the following documents:

Current Unemployment award letter showing start date and maximum and weekly benefit amounts

> HOMEOWNERS ASSOCIATION DOCUMENTATION SHOWING AMOUNT
> AND FREQUENCY OF PAYMENT
> Most recent SIGNED copy of tax return 1040s including all schedules

(*See* September 15, 2013 letter, attached as Exhibit AD.) This letter provided that he had until October 15, 2013 to provide the requested documents. (*Id.*) The letter also stated: "Please note that during this evaluation period, your home **will not be referred to foreclosure**." (*Id.*) (emphasis added.)

**October 2013**

75.     On October 9, 2013, the Scatas Answered U.S. Bank's Motion explaining Nationstar's corrupt and fraudulent handling of their loan modification.

76.     On or about October 17, 2013, Nationstar sent Mr. Scata another copy for Form Letter Two informing him that Nationstar was "missing" the following documents:

> Current Unemployment award letter showing start date and maximum and weekly
> benefit amounts
> HOMEOWNERS ASSOCIATION DOCUMENTATION SHOWING AMOUNT
> AND FREQUENCY OF PAYMENT
> Most recent SIGNED copy of tax return 1040s including all schedules

(*See* October 17, 2013 letter, attached as Exhibit AE.) This letter provided that he had until November 1, 2013 to provide the requested documents. (*Id.*) The letter also stated: "Please note that during this evaluation period, your home **will not be referred to foreclosure**." (*Id.*) (emphasis added.)

77.     On October 28, 2013, in the face of the Scatas' answer documenting Nationstar's mishandling of their loan modification, U.S. Bank filed a Withdrawal of Motion for Order Authorizing Sale. On October 29. 2013, the Court issued an Order Dismissing the Motion for Order Authorizing Sale and closed the case.

78.     On or about October 30, 2013, Mr. Scata sent a fax to Duane Fenton of Nationstar, his single point of contact, including his Homeowners Association Statement, his 2011 signed tax return, and a statement that the income reported was business income, rather than unemployment income.

**November 2013**

79.     On or about November 2, 2013, Nationstar sent Mr. Scata another copy of Form Letter Two informing him that Nationstar was "missing" the following documents:

IRS W2 or 1099
SCHEDULE 1120S

(*See* November 2, 2013 letter, attached as Exhibit AF.) This letter provided that he had until December 2, 2013 to provide the requested documents. (*Id.*) The letter also stated: "Please note that during this evaluation period, your home **will not be referred to foreclosure**." (*Id.*) (emphasis added.)

80.     On or about November 8, 2013, Mr. Scata sent Nationstar his 2012 Form 1040 and K-1's for all active entities. (*See* November 2013 Letters, attached as Group Exhibit AG.) On or about November 22, 2013, Mr. Scata resent the same package of document after Nationstar claimed to have never received his November 8, 2013 package. (*Id.*) Nationstar confirmed receipt. On or about November 30, 2013, Mr. Scata wrote and sent a third letter (this time to Paris at Nationstar) explaining, among other things, that (1) he has never reported unemployment income on an application, but rather self-employment income, and (2) he faxed his 1099-R on November 22, 2013. (*Id.*)

**December 2013**

81.     On or about December 4, 2013, Medved sent the Scatas another letter informing them that their loan has been referred to foreclosure. The letter stated "**YOUR MORTGAGE LOAN HAS BEEN REFERRED TO OUR FIRM FOR FORECLOSURE**." (*See* December 4, 2013 Foreclosure Notice, attached as Exhibit AH.) The letter further advised the Scatas that they still have alternatives and encouraged them to provide information to Nationstar to determine whether they qualify for a loss mitigation alternative, such as a loan modification.

82.     On or about December 16, 2013, after having spoken with a Nationstar representative who informed Mr. Scata that his Form 1099 had never been uploaded for review, Mr. Scata resent the package containing his Form 1099-R and expressly asked the representative to "upload it for the underwriters review." (*See* December 2013 Letters, attached as Group Exhibit AI.) On or about December 30, 2013, Mr. Scata once again sent his Form 1099, informing Nationstar representative Nickolas that he had sent the document on November 22, 2013, December 3, 2013, and December 16, 2013 and asking him to "please upload it for the underwriters review." (*Id.*)

83.     To date, Nationstar has not confirmed that his documents have been uploaded for review and nor have they provided him with a written decision on his application for a HAMP loan modification. As evidenced by the December 4, 2013 notification, the Scatas continue to face the threat that their home will be foreclosed on given Nationstar's mishandling of their loan modification.

## CLASS ALLEGATIONS

84.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full. This class action is brought by Plaintiffs on behalf of Classes of borrowers defined as follows:

**Form Letter One Class:** All homeowners nationwide to whom Nationstar sent Form Letter One whose loans were referred to foreclosure and/or foreclosed on where Nationstar failed to send a written notification regarding its determination on the homeowners' HAMP loan modification application prior to referring the loan to foreclosure and/or conducting a foreclosure sale.

**Colorado Form Letter One Subclass:** All Colorado homeowners to whom Nationstar sent Form Letter One whose loans were referred to foreclosure and/or foreclosed on where Nationstar failed to send a written notification regarding its determination on the homeowners' HAMP loan modification application prior to referring the loan to foreclosure and/or conducting a foreclosure sale where the homeowners' loans were in default when Nationstar assumed the MSRs for their loans.

**Form Letter Two Class:** All homeowners nationwide to whom Nationstar sent Form Letter Two whose loans were referred to foreclosure and/or sold at a foreclosure sale prior to expiration of the evaluation period.

**Colorado Form Letter Two Subclass:** All Colorado homeowners to whom Nationstar sent Form Letter Two whose loans were referred to foreclosure and/or sold at a foreclosure sale prior to expiration of the evaluation period where the homeowners' loans were in default when Nationstar assumed the MSRs for their loans.

**Colorado Default Borrower Class:** All Colorado homeowners whose loans were serviced by Nationstar during the previous year, who had the mortgage servicing rights for their loans transferred from another loan servicer to Nationstar, and whose loans were in default when the servicing rights were transferred.

Excluded from the Classes are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; and (4) the legal representatives, successors or assigns of any such excluded persons. Plaintiffs anticipate that amending the Class Definitions may become necessary following discovery.

85.     Plaintiffs sue on their own behalf and on behalf of the above-defined Classes under Rule 23(a) and (b) of the Federal Rules of Civil Procedure.

86.     Plaintiffs do not know the exact size or identities of the members of the proposed Classes, since such information is in the exclusive control of Defendant.

87.     Plaintiffs believe that the Classes encompass hundreds, if not thousands, of individuals whose identities can be readily determined from Defendant's books and records. Publically available information reveals that, as of September 2013, Nationstar owned the MSRs for loans with an aggregate unpaid principal balance in excess of $375 billion.[5] Publically available information further reveals that, as of May 2013, Nationstar had received 342,861 HAMP applications from borrowers and that, of those applications, it has denied 238,785 (69.6%) and failed to even process 36,192 (10.5%).[6] Therefore, Plaintiffs reasonably believe that the Classes consists of hundreds, if not thousands, of borrowers. The proposed Classes are therefore so numerous that joinder of all members is impracticable.

88.     Based on the size of the alleged actual and statutory damages, and number of class members at issue, Plaintiffs believe the amount in controversy readily exceeds $5 million. All members of the respective Classes have been subject to and affected by the same conduct. The claims are based on form notices, uniform loan modification processing requirements, and uniform foreclosure practices, including Nationstar's repeated referral of loans to foreclosure while they are being evaluated for a modification. There are questions of law and fact that are common to the respective Class members and that are subject to common proof, and

---

[5]     About Us, https://www.nationstarmtg.com/customercenter/AboutUs.aspx, last viewed December 17, 2013.

[6]     HAMP Application Activity by Servicer (May 2013), http://www.treasury.gov/initiatives/ financial-stability/reports/Documents/May%20HAMP%20Activity%20by%20Servicer.pdf

predominate over any questions affecting only individual members of the Classes. These questions include, but are not limited to the following:

> a. Whether Nationstar was obligated to review HAMP applications for borrowers to whom it sent Form Letter One,
>
> b. Whether Nationstar was obligated to send Form Letter One Class members written notification regarding Nationstar's decision on their HAMP applications,
>
> c. Whether Nationstar waived its right to foreclose on Form Letter One Class members prior to sending such Class members a written notification regarding Nationstar's decision on their HAMP applications,
>
> c. Whether Nationstar falsely represented to Plaintiff and the Form Letter One Class members that Nationstar would not refer their loans to foreclosure and/or conduct a foreclosure sale prior to providing written notification regarding Nationstar's decision on their HAMP applications,
>
> d. Whether Nationstar was obligated to evaluate HAMP applications for borrowers to whom it sent Form Letter Two,
>
> e. Whether Nationstar waived its right to foreclose on Form Letter Two Class members prior to the expiration of the evaluation period,
>
> f. Whether Nationstar falsely represented to Form Letter Two Class members that Nationstar would not refer their loans to foreclosure and/or conduct a foreclosure sale prior to the expiration of the evaluation period,
>
> g. Whether Nationstar threatened to take action that it was not legally authorized to take in violation of the FDCPA,
>
> h. Whether Nationstar failed to obtain a license to operate as a collection agency in the State of Colorado in violation of the CFDCPA,
>
> i. Whether Plaintiffs and the other Class Members have suffered damages, and
>
> j. Whether Nationstar's conduct with respect to Plaintiffs and the other Class Members can be enjoined as to all of them such that injunctive relief and corresponding declaratory relief are appropriate.

89.    Plaintiffs' claims are typical of the claims of the Classes and do not conflict with

the interests of any other members of the Classes in that both the Plaintiffs and the other members of the Classes were subject to the same conduct, received the same notices, were met with the same refusal to acknowledge receipt of their documents, and/or were referred to foreclosure and/or foreclosed on during the modification evaluation period.

90.     Plaintiffs will fairly and adequately represent the interests of the Classes, are committed to the vigorous prosecution of the claims, and have retained attorneys who are qualified to pursue this litigation and have experience in class actions and HAMP litigation specifically.

91.     This putative class action meets both the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

92.     The Defendant has acted or refused to act on grounds that apply generally to the Classes so that final injunctive relief or corresponding declaratory relief is appropriate with respect to the Classes as a whole.

93.     Common issues predominate and are central to the litigation over any perceived individual issues. A class action is superior to other methods for the fast and efficient adjudication of this controversy. A class action regarding the issues in this case does not create any problems of manageability.

**COUNT I**
**Fraudulent Misrepresentation**
**(On behalf of Plaintiffs Individually and the Form Letter One Class)**

94.     Plaintiffs re-allege and incorporate the above allegations as if set forth fully herein.

95.     Plaintiffs bring this claim on their own behalf and on behalf of each member of

the Form Letter One Class described above.

96.     On or about July 13, 2013, Nationstar sent a form letter to Mr. Scata at his home address stating that Nationstar had received the Scatas' HAMP documents and that Nationstar would review the Scatas' documents to verify their eligibility for the HAMP modification. (*See* Ex. W.) According to Nationstar, the review process could take between 20-60 days and Nationstar would send a written notification once an eligibility determination was made.

97.     On information and belief, the letter sent on July 13, 2013 is a form letter that is sent to many Nationstar borrowers. Mr. Scata believes that the letter dated July 13, 2013 is indeed a form letter in part because he had previously received a letter in substantially the same form dated March 24, 2013. (*See* Ex. M.)

98.     In relevant part, Form Letter One stated:

Thank You! We have received your documentation for the Making Home Affordable Modification Program (HAMP).

Nationstar Mortgage will now review your information to verify that you are eligible for this program. This review process can take between 20-60 days. Nationstar will review the contents of the Financial Solicitation Package and determine if you are eligible for the HAMP based on your gross income. Once a determination is made, you will be sent a written notification of the decision. If it is determined that you are ineligible for HAMP, you will be referred for alternative workout solutions. Please note that **during this evaluation period, your home will not be referred to foreclosure** or if your loan has been previously referred to foreclosure, we will continue the foreclosure process while we evaluate your loan for HAMP. However, **no foreclosure sale will be conducted and you will not lose your home** during the HAMP evaluation.

Nationstar will contact you if more information is needed in order to fully evaluate your request for HAMP.

(*See* Exs. M, W.) (emphasis included in part, added in part.)

99.     Nationstar's representations in Form Letter One were false. Nationstar did not review the Scatas' eligibility for a HAMP modification and did not provide written notification of whether the Scatas were eligible for a HAMP modification.

100.    Further, Nationstar falsely represented that the Scatas' loan would not be referred to foreclosure and that, if their loan had been previously referred to foreclosure, a foreclosure sale would not be completed. The Scatas' loan had not been referred to foreclosure before they received the July 13, 2013 letter. However, on or about August 22, 2013, before the 20 to 60-day anticipated review period had even expired and before the Scatas' received any written notification regarding Nationstar's decision on their HAMP application (notably, to date the Scatas are still awaiting such a written notification), the Scatas received notification that Nationstar had referred their loan to foreclosure.

101.    Nationstar acted knowingly, or with reckless disregard for the truth of its statements, in falsely representing that the Scatas would be reviewed for HAMP eligibility, that Nationstar would provide the Scatas with written notification regarding Nationstar's determination on such eligibility, and that the Scatas would not be referred to foreclosure prior to receiving written notification regarding their HAMP eligibility. In reality, Nationstar had no intention of actually reviewing the Scatas' loan for HAMP eligibility and did in fact intend to foreclose on the Scatas regardless of whether Nationstar provided the Scatas with written notification regarding their HAMP eligibility.

102.    Plaintiffs and the putative Form Letter One Class members justifiably relied on Nationstar's misrepresentations that Nationstar would review their eligibility for a HAMP modification, provide written notification regarding such determinations, and refrain from

referring their loans to foreclosure or conducting a foreclosure sale during the review period. Nationstar was the sole entity with knowledge regarding its HAMP modification review and foreclosure practices and only Nationstar could communicate to Plaintiffs and the Class members whether it would review borrowers' HAMP eligibility, provide written determination of Plaintiffs' and the Class members' eligibility, and/or refer loans to foreclosure or conduct a foreclosure sale, and Nationstar had executed an agreement with the government assuring it would perform such tasks.

103.    In reliance on Nationstar's false representations that Nationstar would in fact review their eligibility for a HAMP modification and provide written notification of such a decision, and that the their loan would not be referred to foreclosure during the review period or that no foreclosure sale would be completed, Plaintiffs and the Form Letter One Class members refrained from taking other actions to save their homes from foreclosure, such as declaring bankruptcy. Plaintiffs and the Class members also continued to send documents to Nationstar at its request, which Nationstar repeatedly represented were necessary for the review process.

104.    Plaintiffs and the Form Letter One Class members suffered damages as a result of Nationstar's fraudulent misrepresentation, including but not limited to being:

a.    Forced to re-send Nationstar HAMP applications and documents including large packets of information, either via fax or mail, at the borrowers' expense, even though Nationstar had no intention of actually reviewing the borrowers for a HAMP modification,

b.    Subject to or threatened with foreclosure,

c.    Forced to retain and pay legal counsel to assist with fighting unlawful foreclosures, or to aid with seeking other alternatives to avoid foreclosure, or otherwise forced to expend resources fighting foreclosure proceedings, and

d.    Subject to emotional distress caused by Nationstar dragging out the HAMP

34

process, sending default letters, claiming to have never received documents, instituting foreclosure proceedings even though the borrowers received form letters stating their homes would not be referred to foreclosure, and the embarrassment associated with public notices regarding foreclosure.

105.    Plaintiffs, on behalf of themselves and the putative First Form Letter Class members, seek actual, compensatory, and punitive damages for Defendant's fraudulent misrepresentations, as well as interest, and attorneys' fees and costs in the amount to be determined at trial.

## COUNT II
### Fraudulent Misrepresentation
### (On behalf of Plaintiffs Individually and the Form Letter Two Class)

106.    Plaintiffs re-allege and incorporate the above allegations as if set forth fully herein.

107.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Form Letter Two Class described above.

108.    On or about July 27, 2013, Nationstar sent Mr. Scata a form letter at his home address informing him that (1) Nationstar was missing certain required documents, (2) Mr. Scata will become ineligible for a HAMP modification if he does not provide such documents, (3) such documents are necessary to evaluate his request for a HAMP modification, and (4) during the evaluation period Mr. Scata's loan would not be referred to foreclosure, or if his loan had been previously referred to foreclosure, no foreclosure sale would be completed. (*See* Ex. Z.) The form letter sent to Mr. Scata indicated that he had until August 26, 2013 to provide Nationstar with the required documents.

109.    On information and belief, the letter sent on July 27, 2013 is a form letter that is sent to many Nationstar borrowers. Mr. Scata believes that the letter dated July 27, 2013 is

indeed a form letter in part because he had previously received a letter in substantially the same form dated July 14, 2013 and received subsequent copies of substantially the same letter on August 30, 2013, September 15, 2013, and October 17, 2013. (*See* Exs. W, Y, AB, AC, AD.)

110.    In relevant part, the Second Form Letter stated:

> Thank you for sending in the documents needed to evaluate your request for the federal government's Home Affordable Modification Program (HAMP). However, we are missing the following required documents . . .
>
> **If you fail to send in these document(s), you will become ineligible for the HAMP modification.**
>
> Please note that **during this evaluation period, your home will not be referred to foreclosure** or if your loan has been previously referred to foreclosure, we will continue the foreclosure process while we evaluate your loan for HAMP. However, **no foreclosure sale will be conducted and you will not lose your home** during the HAMP evaluation.

(*Id.*) (emphasis included in part, added in part.)

111.    The representations in Nationstar's July 27, 2013 form letter were false. On or about August 22, 2013, before the evaluation period (which, at a minimum extended to August 26, 2013, the deadline for the Scatas to provide documents) had expired, the Scatas received notification that Nationstar had referred their loan to foreclosure. Therefore, Form Letter Two falsely informed Plaintiffs and the Form Letter Two Class members that their home loans would not be referred to foreclosure and/or that foreclosure sales would not be completed during the evaluation period.

112.    Nationstar acted knowingly, or with reckless disregard for the truth of its statements, in falsely representing that the Scatas' and Form Letter Two Class members' loans would not be referred to foreclosure during the evaluation period. In reality, Nationstar had no intention of actually reviewing the Scatas' and Class members' loans for HAMP eligibility, had

not taken any action to prevent the loan from being referred to foreclosure while HAMP eligibility was being determined, and did not intend to refrain from foreclosing on the Scatas' and the Class members' loans during any such evaluation period.

113.   Plaintiffs and the Form Letter Two Class members justifiably relied on Nationstar's misrepresentations that it would not refer their loans to foreclosure or conduct a foreclosure sale during the review period. Nationstar was the sole entity with knowledge regarding its HAMP modification review and foreclosure practices, and only Nationstar could communicate to Plaintiffs and the Class members whether it would review its borrowers' HAMP eligibility and/or refer loans to foreclosure. Nationstar had also signed agreements with the federal government promising to fulfill its duties in accordance with HAMP rules.

114.   In reliance on Nationstar's representations that their loan would not be referred to foreclosure during the review period, Plaintiffs and the Form Letter Two Class members refrained from taking other actions to save their homes from foreclosure, such as declaring bankruptcy. Plaintiffs and the Class members also continued to send documents to Nationstar at its request, which Nationstar represented were necessary for the review process.

115.   Plaintiffs and the Form Letter Two Class members suffered damages as a result of Nationstar's fraudulent misrepresentation, including but not limited to being:

a.   Forced to re-send Nationstar HAMP applications and documents including large packets of information, either via fax or mail, at the borrowers' expense, even though Nationstar had no intention of actually reviewing the borrowers for a HAMP modification,

b.   Subject to or threatened with foreclosure,

c.   Forced to retain legal and pay for counsel to assist with fighting unlawful foreclosures, or to aid with seeking other alternatives to avoid foreclosure, or otherwise forced to expend resources fighting foreclosure proceedings that

Nationstar could not properly institute, and

      d.     Subject to emotional distress caused by Nationstar dragging out the HAMP process, sending default letters, claiming to have never received documents, instituting foreclosure proceedings even though the borrowers received form letters stating their homes would not be referred to foreclosure, and the embarrassment associated with public notices regarding foreclosure.

116.     Plaintiffs, on behalf of themselves and the putative Second Form Letter Class members, seek actual, compensatory, and punitive damages for Defendant's fraudulent misrepresentations, as well as interest, and attorneys' fees and costs in the amount to be determined at trial.

<b>COUNT III<br>Promissory Estoppel<br>(On behalf of Plaintiff Individually and the Form Letter One Class)</b>

117.     Plaintiffs re-allege and incorporate the above allegations as if set forth fully herein.

118.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Form Letter Class One described above.

119.     In its July 13, 2013 form letter, Nationstar promised that (1) it would review the Scatas' eligibility for a HAMP modification, (2) the "review process can take between 20-60 days," (3) "[o]nce a determination is made, you will be sent a written notification of the decision," and (4) "during this evaluation period, your home will not be referred to foreclosure" or if your loan has already been referred to foreclosure, "no foreclosure sale will be conducted." (*See* Ex. W.)

120.     Nationstar should reasonably have expected that the promises in Form Letter One would induce action or forbearance by Plaintiffs and the Form Letter One Class members.

Specifically, Nationstar should reasonably have expected that its promises would induce borrowers to continue sending documents at Nationstar's request and the borrowers expense and to refrain from exploring other foreclosure alternatives.

121.    Plaintiffs and the Form Letter One Class members reasonably relied on Nationstar's misrepresentations that Nationstar would review their eligibility for a HAMP modification and that Nationstar would not refer their loans to foreclosure or conduct a foreclosure sale during the review period. Nationstar was the sole entity with knowledge regarding its HAMP modification review and foreclosure practices, and only Nationstar could communicate to Plaintiffs and the Class members whether it would review borrowers' HAMP eligibility and/or refer loans to foreclosure. Nationstar had also signed agreements with the federal government promising to fulfill its duties in accordance with HAMP rules

122.    Notwithstanding Plaintiffs' and the Form Letter One Class members' reliance, Nationstar failed to honor its promise to review the borrowers' HAMP eligibility and refrain from foreclosing and/or referring loans to foreclosure during the evaluation period and prior to providing the borrowers with written notification regarding their HAMP eligibility. Instead, Nationstar wrongfully referred the borrowers to foreclosure and/or foreclosed on borrowers before reviewing the borrowers' HAMP eligibility and before providing written notification of any such eligibility determinations.

123.    Nationstar's promises, specifically that it would evaluate Plaintiffs' and the Form Letter One Class members' eligibility for a HAMP modification, provide written notification regarding such eligibility, and refrain from referring Plaintiffs' and the First Form Letter Class members' loans to foreclosure or from completing foreclosure proceedings, must be enforced to

prevent injustice.

124.     As a result of Nationstar's conduct, Plaintiffs and the First Form Letter Class members suffered damages as set forth in Paragraph 104 above.

125.     Plaintiffs, on behalf of themselves and the putative Form Letter One Class members, seek actual and compensatory damages in an amount to be determined at trial, specific performance of Nationstar's obligations, together with other relief required by equity and law.

**COUNT IV**
**Promissory Estoppel**
**(On behalf of Plaintiff Individually and the Form Letter Two Class)**

126.     Plaintiffs re-allege and incorporate the above allegations as if set forth fully herein.

127.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Form Letter Two Class described above.

128.     In its July 27, 2013 form letter, Nationstar promised that the Scatas' loan would not be referred to foreclosure during the evaluation period, or if their loan had already been referred to foreclosure, that a foreclosure sale would not be completed. (*See* Ex. Z.) According to the letter, the Scatas' had until August 26, 2013 to provide the documents that were supposedly necessary for Nationstar to complete such a review. (*Id.*)

129.     Nationstar should reasonably have expected that the promises in its form letter would induce action or forbearance by Plaintiffs and the Form Letter Two Class members. Specifically, Nationstar should reasonably have expected that its promises would induce borrowers to continue sending documents at Nationstar's request and to refrain from exploring other foreclosure alternatives.

130.    Plaintiffs and the Form Letter Two Class members reasonably relied on Nationstar's misrepresentations that Nationstar would review their eligibility for a HAMP modification and that Nationstar would not refer their loans to foreclosure or conduct a foreclosure sale during the evaluation period. Nationstar was the sole entity with knowledge regarding its HAMP modification review and foreclosure practices and only Nationstar could communicate to Plaintiffs and the Class members whether it would review borrowers' HAMP eligibility and/or refer loans to foreclosure. Nationstar had also signed agreements with the federal government promising to fulfill its duties in accordance with HAMP rules

131.    Notwithstanding Plaintiffs' and the Form Letter Two Class members' reliance, Nationstar failed to honor its promise to review the borrowers' HAMP eligibility and refrain from foreclosing during the evaluation period. Instead, Nationstar wrongfully referred the borrowers to foreclose before reviewing the borrowers' HAMP eligibility and before providing written notification of their eligibility determinations.

132.    Nationstar's promises, specifically that it would refrain from referring Plaintiffs' and the Form Letter Two Class members' loans to foreclosure or from completing foreclosure proceedings during the evaluation period, must be enforced to prevent injustice.

133.    As a result of Nationstar's conduct, Plaintiffs and the Form Letter Two Class members suffered damages as set forth in Paragraph 115 above.

134.    Plaintiffs, on behalf of themselves and the Form Letter Class Two members, seek actual and compensatory damages in an amount to be determined at trial, specific performance of Nationstar's obligations, together with other relief required by equity and law.

**COUNT V**
**Violation of the Fair Debt Collection Practices Act ("FDCPA")**
**15 U.S.C. § 1692e**
**(On behalf of Plaintiff Individually and the Colorado Form Letter One Subclass)**

135.    Plaintiffs re-allege and incorporate the above allegations as if set forth fully herein.

136.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Colorado Form Letter One Subclass described above.

137.    Plaintiffs are "consumers" within the meaning of FDCPA § 803(3) because they are natural persons who are obligated to pay a debt. The Scatas' loan was in default when Nationstar acquired the MSRs for their loan.

138.    Section 15 U.S.C. § 1698e of the Fair Debt Collection Practices Act ("FDCPA") provides that "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." It further specifies that "the following conduct is a violation of this section: . . .  **(5)** The threat to take any action that cannot legally be taken."

139.     Defendant is a "debt collector" within the meaning of the FDCPA § 804(6) because the Scatas' loan was in default when the servicing rights were transferred from Aurora to Nationstar. "Debt collector" under the FDCPA includes servicers who, as with Nationstar, acquire the MSRs to a loan that is already in default. *See Garrett v. BNC Mortgage, Inc.*, 929 F. Supp. 2d 1120, 1125-26 (D. Colo. 2013) (citing *Solomon v. HSBC Mortg. Corp.,* 395 Fed.Appx. 494, 495 (10th Cir. 2010)).

140.    Under Colorado law, "[f]or a moving party to show that it is entitled to initiate a public trustee foreclosure sale, it must provide evidence of default and establish that it is the real

party that is entitled to enforce the power of sale contained in the deed of trust." *May v. U.S. Bank, N.A.*, No. 13-CV-01621-PAB-MJW, 2013 WL 4462033 (D. Colo. Aug. 20, 2013) (citing *Goodwin v. Dist. Court In & For Sixteenth Judicial Dist.*, 779 P.2d 837, 843 (Colo. 1989) "By contrast, a debtor objecting to the issuance of an order authorizing sale may present relevant evidence challenging whether the 'moving parties are the real parties in interest and also [whether] the **asserted defenses of waiver and estoppel**' are applicable." *Id.* (emphasis added).

141.   Defendant, as a debt collector, threatened to foreclose on Plaintiffs' and the Colorado Form Letter One Class members' loans even through Defendant had no right to foreclose on Plaintiffs' and the Class members' loans because it had waived any such right. Specifically, in its July 13, 2013 letter, Nationstar promised (1) the "review process can take between 20-60 days," (2) "[o]nce a determination is made, you will be sent a written notification of the decision," and (3) "during this evaluation period, your home will not be referred to foreclosure" or if your loan has already been referred to foreclosure, "no foreclosure sale will be conducted." (*See* Ex. W.) Thus, Nationstar waived its right to refer Plaintiffs' and the Class members' loans to foreclosure or to complete foreclosure sales prior to providing them with a "written notification" of its decision—which to-date Nationstar has not provided. Or, at a bare minimum, Nationstar waived its right to refer Plaintiffs' and the Class members' loan to foreclosure or to complete foreclosure sales prior to the expiration of the 60-day review period (which, in the Scatas' case, didn't expire until September 11, 2013—twenty days after Medved sent notice that their loan had been referred to foreclosure).

142.   As one of the largest loan servicing organizations, Nationstar was or should have been aware of its obligations under the FDCPA, including the prohibition on threating to

foreclose on borrowers where Nationstar has waived the right to do so.

143.     Plaintiffs, on behalf of themselves and the Colorado Form Letter One Subclass members, seek declaratory judgment that Nationstar's actions violation the FDCPA, the maximum statutory damages provided under 15 U.S.C. § 1692k, actual damages, plus costs and attorneys fees.

**COUNT VI**
**Violation of the Fair Debt Collection Practices Act ("FDCPA")**
**15 U.S.C. § 1692e**
**(On behalf of Plaintiff Individually and the Colorado Form Letter Two Subclass)**

144.     Plaintiffs re-allege and incorporate the above allegations as if set forth fully herein.

145.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Colorado Form Letter Two Subclass described above.

146.     Plaintiffs are "consumers" within the meaning of FDCPA § 803(3) because they are natural persons who are obligated to pay a debt. The Scatas' loan was in default when Nationstar acquired the MSRs for their loan.

147.     Section 15 U.S.C. § 1698e of the Fair Debt Collection Practices Act ("FDCPA") provides that "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." It further specifies that "the following conduct is a violation of this section: . . .  **(5)** The threat to take any action that cannot legally be taken."

148.      Defendant is a "debt collector" within the meaning of the FDCPA § 804(6) because the Scatas' loan was in default when the servicing rights were transferred from Aurora to Nationstar. 'Debt collector' under the FDCPA includes servicers who, as with Nationstar,

acquire the MSRs to a loan that is already in default. *See Garrett v. BNC Mortgage, Inc.*, 929 F. Supp. 2d 1120, 1125-26 (D. Colo. 2013) (citing *Solomon v. HSBC Mortg. Corp.,* 395 Fed.Appx. 494, 495 (10th Cir. 2010)).

149.     Defendant, as a debt collector, threatened to foreclose on Plaintiffs' and the Colorado Form Letter Two Class members' loans even though Defendant had no right to foreclose on Plaintiffs' and the Class members' loans because it had waived any such right. Specifically, in its July 27, 2013 letter, Nationstar promised that it would not foreclose on Defendants "during this evaluation period" and gave Defendants until August 26, 2013 to submit additional documents. (*See* Ex. Z.) Thus, Nationstar waived its right to refer Plaintiffs' and the Class members' loans to foreclosure or to complete foreclosure sales prior to expiration of the "evaluation period," which at a minimum extended through the deadline established by Nationstar for the Scatas' to provide additional documentation. (*See id*.)

150.     As one of the largest loan servicing organizations, Nationstar was or should have been aware of its obligations under the FDCPA, including the prohibition on threating to foreclose on borrowers where Nationstar has waived the right to do so.

151.     Plaintiffs, on behalf of themselves and the Colorado Form Letter One Subclass members, seek declaratory judgment that Nationstar's actions violate the FDCPA, the maximum statutory damages provided under 15 U.S.C. § 1692k, actual damages, plus costs and attorneys fees.

## COUNT VII
### Violation of the Colorado Fair Debt Collection Practices Act
### C.R.S. § 12-14-115
### (On behalf of Plaintiff Individually and the Colorado Default Borrower Class)

152.     Plaintiffs re-allege and incorporate the above allegations as if set forth fully

herein.

153.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Colorado Default Borrower Class described above.

154.    Plaintiffs are "consumers" within the meaning of C.R.S. § 12-14-103 because they are natural persons who are obligated to pay a debt. The Scatas' loan was in default when Nationstar acquired the MSRs for their loan.

155.    The Colorado Fair Debt Collection Practices Act provides "[i]t is unlawful for any person to: (a) Conduct the business of a collection agency . . . without having obtained a license under this article." C.R.S. § 12-14-115.

156.    "Collection agency" under the CFDCPA includes any: "(I) Person who engages in a business the principal purpose of which is the collection of debts; or (II) Person who: (A) Regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another; (B) Takes assignment of debts for collection purposes . . . ." C.R.S. § 12-14-103. The CFDCPA contains language nearly identical to that in the FDCPA, but uses the term "collection agency" rather than "debt collector." *Udis v. Universal Commc'ns Co.*, 56 P.3d 1177, 1180 (Colo. Ct. App. 2002).

157.    'Debt collector' under the FDCPA includes servicers who, as with Nationstar, acquire the MSRs to a loan that is already in default. *Garrett v. BNC Mortgage, Inc.*, 929 F. Supp. 2d 1120, 1125-26 (D. Colo. 2013) (citing *Solomon v. HSBC Mortg. Corp.,* 395 Fed.Appx. 494, 495 (10th Cir. 2010)); *Games v. Cavazos*, 737 F. Supp. 1368, 1384 (D. Del. 1990) ("to the extent the mortgage servicing company receives delinquent accounts for collection it is a debt collector with respect to those accounts"). Defendant is therefore a "collection agency" under the

46

CFDCPA because it qualifies as a "debt collector" under the FDCPA.

158.    Defendant conducts business within the State of Colorado as a collection agency because it acts as the Servicer for Plaintiffs' and the Colorado Default Borrower Class Members' loans, including the collection of Plaintiffs' and the Class Members' loans, which were in default when the MSRs for those loans were transferred to Nationstar.

159.    Defendant therefore violates C.R.S. § 12-14-115 because is not a licensed collection agency within the State of Colorado. *See Attorney General, Colorado Department of Law,* Collection Agencies License Information, Dec. 17, 2013, http://www.coloradoattorney general.gov/sites/default/files/uploads/cab/CabReport.pdf.

160.    As one of the largest loan servicing organizations, Nationstar was or should have been aware of its licensing obligations under the CFDCPA.

161.    Plaintiffs, on behalf of themselves and the Colorado Default Borrower Class members, seek declaratory judgment that Nationstar's actions violate the CFDCPA, the maximum statutory damages provided under C.R.S. § 12-14-113, actual damages, plus costs and attorneys fees.

## PRAYER FOR RELIEF

**WHEREFORE,** in light of the foregoing, Plaintiffs, on behalf of themselves and Classes of all others similarly situated, respectfully prays that the Court enter an Order:

a.    Certifying this action as a Class Action, appointing Plaintiffs as Class Representative and their Counsel as Class Counsel,

b.    Entering judgment against Nationstar and in favor of Plaintiffs and the Classes for actual and compensatory damages as described herein on Counts I, II, III, IV, V, VI, and VII in

amounts to be proven at trial,

      c.     Entering judgment against Nationstar and in favor of Plaintiffs and the Classes for statutory damages as described herein on Counts V, VI and VII,

      d.     Where damages present an inadequate remedy at law on any Count, entering judgment against Nationstar and in favor of Plaintiffs and the Class members for specific performance requiring that provide written notification regarding decisions on borrowers' HAMP eligibility, terminate any foreclosure proceedings, unwind any foreclosure sales, and restore them to possession of their wrongfully foreclosed homes covering all attendant fees and costs,

      e.     Awarding punitive damages on Counts I and II against Nationstar,

      f.     Awarding injunctive relief requiring Nationstar to correct negative credit information,

      g.     Awarding damages for emotional pain, suffering and other actual, non-economic damages caused by Nationstar's wrongful and fraudulent servicing practices,

      h.     Awarding Plaintiff reasonable attorneys' fees and costs, and

      i.     Awarding such additional relief as the Court deems necessary and just.

Dated: January 22, 2014           Respectfully submitted,

                                       /s/ Megan L. Lindsey
                                   One of Plaintiff's Attorneys

Jay Edelson
jedelson@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654

Tel: 312.589.6370
Fax: 312.589.6378

Steven L. Woodrow
swoodrow@edelson.com
Megan L. Lindsey
mlindsey@edelson.com
EDELSON PC
999 18th Street, Suite 3000
Denver, Colorado 80202
Tel: 303.357.4877
Fax: 312.589.6378

*Attorneys for Plaintiff and the Putative Class*